Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROBERT KELLY, ELIZABETH ANN KELLY, ABIGAIL KELLY, and M.K., a minor, by her mother and father, her natural guardians,<br><br>*Plaintiffs,*<br><br>v.<br><br>LISA VON PIER, *et al.*,<br><br>*Defendants.* | Civil Action No. 16-3417<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

The present matter comes before the Court by the Municipal Defendants[1] and the State Defendants'[2] (collectively, the "Defendants") motions to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim and Rule 12(b)(1) for lack of subject matter jurisdiction. Plaintiffs Robert Kelly, Elizabeth Ann Kelly, Abigail Kelly and M.K. ("Plaintiffs"

---

[1] The Municipal Defendants consist of the Borough of Wharton, the Borough of Wharton Zoning and Housing Department, Pedro "Chick" Moreno (Director of the Borough of Wharton Zoning and Housing), the Township of Mount Olive, Brian Dunster (Animal Control Officer of the Mount Olive Township Department of Health), Susan Downer (Registered Environmental Health Specialist for the Township of Mount Olive), and Frank Wilpert Sr. (Health Officer and Director of Mount Olive Township Department of Health).

[2] The State Defendants consist of Allison Blake (Commissioner of the Department of Children and Families ("DCF")), Lisa Von Pier (Director of the Division of Child Protection and Permanency ("DCPP")), Beryl Lichter (DCPP Supervisor), Melissa Walkiewicz (DCPP Caseworker), Grace Bent (DCPP Caseworker), and Monica Heiman (DCPP Caseworker).

or the "Kellys")[3] oppose these motions.[4] This case concerns allegations that Defendants conspired to falsely report and investigate allegations of child abuse against the Kellys, in violation of their constitutional rights. This motion was decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.

The Court has considered the parties' submissions and grants in part and denies in part the Municipal Defendants' motion. The Municipal Defendants' motion is granted as to Counts I-V and those counts are dismissed without prejudice. The motion is denied as to the statute of limitations argument. However, because no counts remain against the Municipal Defendants, the Amended Complaint is dismissed as to them. The Court also grants in part and denies in part the State Defendants' motion. The motion is granted as to Counts II, III, and VIII, and those counts are dismissed without prejudice. The motion is denied as to the statute of limitations. Thus, Counts I and IV remain as to the State Defendants.

---

[3] The children, Abigail Kelly and minor M.K. will be referred to collectively as the "Kelly Children."

[4] The Municipal Defendants' brief in support of their motion to dismiss the Amended Complaint will be referred to hereinafter as "Mun. Def. Br." (D.E. 12); Plaintiff's opposition to the Municipal Defendants' motion to dismiss will be referred to "Pl. Mun. Opp'n" (D.E. 24); and the Municipal Defendants' reply brief will be referred to "Mun. Def. R.Br." (D.E. 27).

The State Defendants' brief in support of their motion to dismiss the Amended Complaint will be referred to hereinafter as "State Def. Br." (D.E. 20); Plaintiff's opposition to the State Defendants' motion to dismiss will be referred to "Pl. State Opp'n" (D.E. 30); and Defendants' reply brief will be referred to "State Def. R.Br." (D.E. 33).

## I. BACKGROUND

The facts of this matter are derived from Plaintiff's First Amended Complaint ("FAC").[5] D.E. 3. Plaintiffs are husband and wife, Robert and Elizabeth Kelly, and their children, Abigail and minor, M.K. FAC ¶¶ 2, 3. The Kellys reside on Anderson Road in the Borough of Wharton, New Jersey. Id. ¶ 40. Defendant Jack Baldwin is a neighbor of the Kelly family, residing adjacent to Plaintiffs on Lowry Avenue. Id. ¶ 42. Baldwin has not made a motion to dismiss.

For a number of years, Jack Baldwin operated a kennel[6] from his home, next to the Kelly residence. Id. ¶ 5. Clients of the kennel often parked on Lowry Avenue and Anderson Road, "crowding the limited space on the local streets." Id. ¶ 49. Additionally, dogs barked loudly throughout the day and night. Id. ¶ 50. In early 2013, the Borough of Wharton received a complaint about Baldwin's kennel and an investigation led to its closure in May 2013. Id. ¶¶ 51-53. Plaintiffs allege that they "did not file the complaint that prompted the shutdown of Baldwin's business." Id. ¶ 56. Nevertheless, in May 2013, Plaintiffs' attorney, Dennis R. McConnell, received a document indicating that the investigation into Baldwin's kennel operation was due to a complaint from Mr. Kelly. Id. ¶¶ 58, 61. The complaint alleged an accumulation of "dog feces[,] which is washed into the neighbors' yard causing odor and unhealthy condition[s]." Id. ¶ 62. It also stated that Dunster, Moreno and Downer participated in the investigation of the kennel. Id. ¶¶ 60, 63.

Plaintiffs allege that the misunderstanding about the source of the kennel complaint, coupled with the closure of Baldwin's business, was the basis of Baldwin's decision to exact

---

[5] When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[6] While Plaintiffs refer to Baldwin's business as a "kennel," the description is more akin to a dog breeding business. Because the parties refer to it as a "kennel," the Court will also use that term.

revenge. *Id.* ¶¶ 65-67. Plaintiffs allege that Baldwin, in retaliation, conspired with Moreno to "intentionally and maliciously harm the Kelly family" by repeatedly subjecting them to investigations by the Division of Child Protection and Permanency ("DCPP"). *Id.* ¶ 68. Thus, "Defendants Moreno and Baldwin repeatedly spied on the Kelly family . . . hoping to find information that could be fed to the DCPP." *Id.* ¶ 69. Plaintiffs allege that Baldwin and Moreno "often observed the Kelly children as they walked to and from school" and "went into the backyard of the Kelly home and spied on activities inside the Kelly home, including a pizza and soda party held by Abigail Kelly and her friends." *Id.* ¶ 71. Finding nothing that could qualify as "abuse and neglect," Defendants Baldwin and Moreno "decided to fabricate information regarding activities inside the Kelly home and the care of the Kelly children" to share with DCPP. *Id.* ¶ 74. Plaintiffs allege that these false reports prompted a "year-long investigation of the Kelly family by the DCPP."[7] *Id.* ¶ 76.

The first DCPP investigation began in May of 2013 when a DCPP caseworker questioned Abigail and M.K. at their respective schools. *Id.* ¶ 85. Plaintiffs allege that "each child was pulled from class without notice, taken to a school official's office and detained against their will, without consent." *Id.* ¶ 88. The caseworker relayed to Abigail and M.K. that they were being interviewed based on an allegation of abuse and neglect against their parents. *Id.* ¶ 89. Later that day, the same caseworker, "believed to be Defendant Monica Heiman," visited the Kelly home to inform Robert and Elizabeth of the investigation. *Id.* ¶ 91. Plaintiffs then let Ms. Heiman into the home "[f]earing

---

[7] While Plaintiffs characterize the investigation as a "year-long" process, as pled, it seems that the DCPP conducted four discrete investigations over the course of one year. After each investigation was completed, it was closed, according to the FAC. Plaintiffs do not plead any facts indicating that any single investigation continued throughout the year.

the removal of the children." *Id.* ¶¶ 92-93. Plaintiffs allege that Ms. Heiman "[d]etained all four plaintiffs against their will, without consent, for more than one hour." *Id.* ¶ 93.

During that time, Ms. Heiman relayed that the allegations came from a close friend who had been inside the home. *Id.* ¶ 94. The allegations were that the children were fed ice cream and cereal; that a ferret was loose in the house; that chickens and birds were roaming freely and leaving feathers all over; that the home was dusty; that boxes were stacked too high and could potentially fall on children; that the children were inappropriately dressed; and that an unsupervised, underage party was hosted in the home. *Id.* ¶¶ 95-97. Ms. Heiman then questioned the children individually, while "Robert and Elizabeth Kelly were ordered to remain downstairs." *Id.* ¶ 101. Ms. Heiman also inspected the entire home. *Id.* ¶ 102. Subsequently, Robert Kelly signed a medical release for the children, "fearing that retaliation from DCPP would ensue if he refused." *Id.* ¶ 103. Plaintiffs allege that "[n]one of the allegations proved plausible, and the caseworker categorized the allegations as a 'vendetta complaint.'" *Id.* ¶¶ 104-05. On May 13, 2013, Robert and Elizabeth received a letter, signed by Defendants Heiman and Lichter, indicating the allegations were unfounded. *Id.* ¶¶ 108-09.

In September 2013, a second investigation ensued. *Id.* ¶ 110. DCPP again detained and interviewed Abagail and M.K. in their schools, allegedly without their parents' consent. *Id.* ¶¶ 111-13. The caseworkers informed the Kelly Children of the abuse and neglect allegations. *Id.* ¶ 114. Another caseworker visited the Kelly home on that same evening, and the Kellys allowed them into their home "[f]earing the removal of [their] children by the DCPP." *Id.* ¶¶ 115-18. All four Plaintiffs were then detained and interviewed as a group "against their will." *Id.* ¶ 118-19. In addition, the children were questioned individually and the home was inspected, but no credible evidence of abuse and neglect was found. *Id.* ¶¶ 120-21. The caseworker again characterized the

allegations as a "vendetta complaint," and Plaintiffs received a letter a few weeks later indicating the allegations were unfounded. *Id.* ¶¶ 122-23.

About five months later, a DCPP caseworker arrived, for the third time, at the school of Abagail and M.K. The caseworker interrogated both children, informing them of allegations of abuse and neglect. *Id.* ¶¶ 124, 126. Plaintiffs add that two caseworkers visited the Kelly home later that evening and conducted a similar investigation as the prior two visits. *Id.* ¶¶ 129-30.[8] As before, the Kelly's received a letter in the mail indicating that the allegations were unfounded. *Id.* ¶ 136.

The final investigation was in May of 2014, when DCPP visited the Kelly Children's schools, detained and interrogated them, and informed them of the allegations. *Id.* ¶¶ 137-39. A DCPP caseworker followed up at the Kelly home that evening, where Plaintiffs were interrogated as a family, the children were questioned individually, and the home was inspected. *Id.* ¶¶ 141, 143. Yet again, Plaintiffs were told that the allegations were an unfounded "vendetta complaint" and a letter arrived on May 9, 2014 noting that the allegations were unfounded. *Id.* ¶¶ 144-45.

On June 13, 2014, Plaintiffs allege that Robert Kelly arrived home early from work. *Id.* ¶¶ 146-47. While in his kitchen, Robert Kelly alleges that he looked outside and saw Jack Baldwin in the Kelly's backyard. *Id.* ¶¶ 149-50. When Robert ran outside to confront Baldwin, Baldwin "[ran] up the hill behind the Kelly home, and into a thicket of bushes and weeds." *Id.* ¶¶ 151-52. While outside, Robert Kelly saw Defendant Moreno who had "in his hand what appear[ed] to be a 35 millimeter camera." *Id.* ¶¶ 153-54. Robert Kelly alleges that both Moreno and Baldwin ran "south through the woods, and around towards Jack Baldwin's property." *Id.* ¶ 155. Robert

---

[8] During this third visit, Robert Kelly was not home. *Id.* ¶ 128. He was ordered, and subsequently reported, to the DCPP office in Randolph, where he spoke with a caseworker who he "believed to be Defendant Grace Bent." *Id.* ¶¶ 133-34.

proceeded to run to the front of his home where he saw Moreno enter his official Borough of Wharton vehicle and drive away, giving Robert Kelly the middle finger. *Id.* ¶¶ 156-61. Robert Kelly then called the town manager to inquire about Moreno's presence on his property, but never received a reply. *Id.* ¶¶ 162-63. Critically, the FAC asserts that when Robert saw Baldwin and Moreno, the "[c]onspiracy" was "[u]ncovered." *Id.* at 19.

The next day, Robert Kelly called a caseworker at DCPP, "believed to be Defendant Melissa Walkiewicz," demanding to know the identity of the person making the false allegations to the DCPP. *Id.* ¶¶ 164-65. At first, the caseworker stated that she "[could not] provide any information to [Robert] Kelly." *Id.* ¶ 166. However, Plaintiffs allege that when Robert Kelly asked her "whether it is the husband of the woman who lives next to the Kelly family," she replied "Yes! Oh my god, you need to file a complaint against him. He is stalking your kids. You need to protect your kids." *Id.* ¶¶ 167-68. Plaintiffs allege that she was referring to Defendant Jack Baldwin. *Id.* ¶ 169.

On June 13, 2016, Plaintiffs brought the present action. They do not allege that any investigations occurred after May of 2014.[9]

## II. PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on June 13, 2016. D.E. 1. On June 15, 2016, they filed their FAC alleging seven causes of action. The following counts apply to all Defendants, unless otherwise indicated: (1) violation of Plaintiffs' Fourth and Fourteenth Amendments Rights

---

[9] Plaintiffs also indicate that following the investigations, M.K. became very emotional at school and relayed to her teacher that she was upset because she might be taken away from her parents. *Id.* ¶¶ 172-73. She told her teacher that she might harm herself and the teacher relayed the information to the principal and Robert Kelly. *Id.* ¶¶ 174-75. Plaintiffs allege that M.K. did not return to school until later in 2015. *Id.* ¶ 176.

based on false imprisonment, 42 U.S.C. § 1983; (2) violation of Plaintiffs' Fourth and Fourteenth Amendments Rights based on the right to be free from child abuse and neglect investigations absent credible evidence, 42 U.S.C. § 1983; (3) conspiracy under 42 U.S.C. § 1985; (4) false imprisonment under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to 10:6-2; (5) defamation – slander (as to Baldwin only); (6) false light invasion of privacy (as to Baldwin only); and (7) violation of Plaintiffs' Fifth and Fourteenth Amendments Rights, 42 U.S.C. § 1983 (as to Defendants Von Pier and Blake only).[10]  In lieu of answering, the Municipal Defendants and the State Defendants each filed a motion to dismiss.  D.E. 12, 20.  Plaintiffs oppose both motions. D.E. 24, 30.

### III. STANDARD OF REVIEW

Defendants bring their motions to dismiss pursuant to Rules 12(b)(6) and 12(b)(1).  The Municipal Defendants bring their 12(b)(1) motion for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine and based on sovereign immunity.[11]  Mun. Def. Br. at 7-8.  Additionally, the State Defendants move to dismiss pursuant to 12(b)(1), arguing that Plaintiffs lack standing to seek an injunction (Count VII), as well as asserting sovereign immunity for the State Defendants. State Def. Br. at 9-10.  Therefore, the Court will address the standards for a motion pursuant to 12(b)(1) and 12(b)(6).

---

[10] Because Counts V and VI are brought against Defendant Baldwin only, and he has not made a motion to dismiss, they are not addressed in this Opinion.

[11] While the Municipal Defendants do not explicitly state that their sovereign immunity argument falls under Rule 12(b)(1), it does.  *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction . . . accordingly, the motion may properly be considered a motion to dismiss the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1).").

a. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

b. Rule 12(b)(1)

In deciding a Rule 12(b)(1) motion to dismiss, a court must first determine whether the party presents a facial or factual attack because that distinction determines how the pleading is reviewed. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "A facial attack concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Young v. United States*, --- F. Supp. 3d ---, 2015 WL 9592442, at *5 (D.N.J. Dec. 2, 2015). Here, Defendants assert the defense of sovereign immunity based on the pleadings, thereby raising a facial attack. *See Perez v. New Jersey*, No. 14-4610, 2015 WL 4394229, at *3 (D.N.J. July 15, 2015) ("[T]he State Defendants' motion asserts the defense of sovereign immunity based on the facts as pleaded in the Second Amended Complaint and is thus a facial attack."). Accordingly, "the court must only consider the allegations of the complaint and documents referenced therein . . . in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

## IV. DISCUSSION

### a. The Municipal Defendants' Motion to Dismiss

At the outset, with the exception of the allegation that Moreno was in the Kelly's backyard,[12] which will be addressed below, the FAC contains no plausible allegations about any

---

[12] All other allegations made concerning Defendant Moreno are conclusory and lack supporting details, such as the approximate date or time that they purportedly occurred. *See, e.g.*, FAC ¶ 69 ("Defendants Moreno and Baldwin repeatedly spied on the Kelly family . . . hoping to find information that could be fed to the DCPP."); *id.* ¶ 71 (alleging that Defendants Baldwin and Moreno "often observed the Kelly children as they walked to and from school" and "went into the backyard of the Kelly home and spied on activities inside the Kelly home, including a pizza and soda party held by Abigail Kelly and her friends."). Critically, the FAC acknowledges that the foregoing allegations are pure speculation because the alleged conspiracy was not first discovered

alleged wrongdoing by any Municipal Defendant. Instead, the remaining Municipal Defendants are merely alleged to have been involved in the kennel investigation; there are no allegations that they engaged in the alleged conspiracy against the Kellys. *See* FAC ¶¶ 59–63. Since there are no allegations of any impropriety, much less plausible assertions, as to the remaining Municipal Defendants, the counts are not properly pled as to them. Thus, the FAC is dismissed as to the Borough of Wharton, the Borough of Wharton Zoning and Housing Department, the Township of Mount Olive, Brian Dunster, Susan Downer and Frank P. Wilpert, Sr. The Court will address the substance of the counts as to Defendant Moreno only.

General Arguments

The Municipal Defendants make numerous arguments that are not persuasive.[13] First, the Municipal Defendants bring a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction under the *Rooker-Feldman* Doctrine. Mun. Def. Br. at 7-8. The *Rooker-Feldman* doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings

---

until approximately June 13, 2014, when Robert Kelly saw Moreno and Baldwin in the Kelly's backyard. Plaintiffs frankly acknowledge this point in their moving papers. *See, e.g.*, Pl. Mun. Opp'n at 26-27 ("As set forth in the Plaintiffs' Complaint and Amended Complaint, it was not until on or after June 13, 2014 that Plaintiffs' became aware and had knowledge of the subject conspiracy, when events led to the DCP&P acknowledging that [its improper actions] . . . were the result of a conspiracy with the Municipal Defendant the Defendant Jack Baldwin, information which had been deliberately withheld from the Plaintiffs up until that point."). Therefore, these earlier allegations are not plausibly pled and will not be considered by the Court.

[13] The Municipal Defendants do not raise the following relevant arguments: (1) custom, policy or practice concerning the municipalities; (2) supervisory liability under Section 1983; and (3) the fact that a party cannot sue an "arm" of a municipality, but may only sue the municipality itself. *See, e.g.*, *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 912 (3d Cir. 2003) ("Police departments cannot be sued alongside municipalities because a police department is merely an administrative arm of the municipality itself."). As a result, the Court does not address these areas.

commenced." *Daniels v. Cynkin*, 34 F. Supp. 3d 433, 438 (D.N.J. 2014) (quoting *Lance v. Dennis*, 546 U.S. 459, 460 (2006)). For the *Rooker-Feldman* doctrine to apply, a plaintiff, who lost in state court, must be "complaining of injuries caused by state-court judgments" in a subsequent federal court proceeding. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010). Thus, four elements are required to assert the *Rooker-Feldman* Doctrine: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Valladares v. Gov't Nat'l Mortg. Ass'n as Tr. for the Ginnie Mae Remic Tr. 2007-002*, No. 15-2408, 2016 WL 1243804, at *3 (D.N.J. Mar. 29, 2016) (quoting *Great W. Mining & Mineral Co.*, 615 F.3d at 166).

In this instance, Plaintiffs did not lose in state court. In fact, there does not appear to have been any state court proceedings whatsoever, much less an appeal from those proceedings. Therefore, the *Rooker-Feldman* doctrine is not applicable.

Next, the Municipal Defendants argue that "the Federal Court lacks jurisdiction over state family law matters." Mun. Def. Br. at 8. While this is true, Plaintiffs do not assert such claims in the FAC. Merely because the alleged facts involve an investigation into a family does not make this case a "family law matter." Rather, this case is predicated on federal law and the Court disagrees with the Municipal Defendants' assertion.

The Municipal Defendants also contend that they are protected by Eleventh Amendment immunity. Mun. Def. Br. at 10. They argue that the Eleventh Amendment protects a state and its departments, as well as state officials, from being subject to suit. *Id*. at 10-11. The Municipal Defendants conclude that "[t]he Borough of Wharton, its Department of Zoning and Housing, and

Mount Olive Township" as well as "the municipal employees" "are all arms of the state and thus protected under sovereign immunity." *Id.* at 11.

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court interprets the Eleventh Amendment to protect states as well as their agencies and departments from suit in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). However, sovereign immunity does not extend to counties and municipalities. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 813-14 (3d Cir. 1991).

Nonetheless, in some circumstances, such entities may be viewed as "arms of the State partaking of the State's Eleventh Amendment immunity . . ." *Mt. Healthy City Bd. of Educ.*, 429 U.S. at 280; *see also Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir. 2005) ("[A] suit may be barred by the Eleventh Amendment even though a state is not named a party to the action, so long as the state is deemed to be the real party in interest."). To determine whether an entity is an "arm of the state," courts look to three factors: "(1) whether the payment of the judgment would come from the state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity has." *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006).

Since sovereign immunity is an affirmative defense,[14] the burden of demonstrating the immunity lies on the party asserting it. *See Carter v. City of Phila.*, 181 F.3d 339, 347 (3d Cir.

---

[14] Although it is an affirmative defense, sovereign immunity can be considered in a motion to dismiss. If an insufficient showing is made, a court can revisit the issue at the summary judgment

1999). While the Municipal Defendants assert they are "arms" of the state, they provide no evidential or factual support for this assertion. They argue that "the payment of any judgment would come from the municipality's treasury from taxpayer funds." Mun. Def. Br. at 11. This assertion seem to indicate the opposite: the municipality is not an arm of the state for purposes of this action. The Municipal Defendants do not assert that a potential payment would emanate from *State* funds. Similarly, the Municipal Defendants point to no evidence indicating that the municipal employees are "arms of the state" subject to sovereign immunity. Therefore, the Municipal Defendants have not met their burden to demonstrate that they are entitled to sovereign immunity.

The Municipal Defendants also cite to various state law immunities. First, they argue that, under New Jersey law, "anyone who makes a report of child abuse and neglect to the DCPP is protected by immunity." Mun. Def. Br. at 12 (citing N.J.S.A. 9:6-8.13) (hereinafter "Reporting Immunity"). They also assert a New Jersey statute, which protects Boards of Health and therefore shields the individual Municipal Defendants from liability. *Id*. at 12-13 (citing N.J.S.A. 26:3-52). Plaintiffs respond that state law immunities do not apply to federal constitutional claims. Pl. Mun. Opp. at 18. Additionally, they argue that the child abuse reporting immunity does not apply when the person reporting has "reasonable cause" to believe a child has been subject to child abuse. *Id*. at 19.

---

stage. *See Sharp v. Kean Univ.*, Civ. No. 14-423, 2014 WL 6908775, at *4 (D.N.J. Dec. 8, 2014) ("On balance, the Court finds that Kean has not made a sufficient showing to support a finding of sovereign immunity at the motion to dismiss stage. Sharp's Complaint is therefore not subject to a Rule 12(b)(1) dismissal. However, the Court may be willing to reconsider the issue at the summary judgment stage following appropriate discovery."); *Mullin v. Balicki*, Civ. No. 11-247, 2013 WL 5935998, at *5 (D.N.J. Nov. 1, 2013) ("Because Movants in their official capacities are immune from suit and because they are not "persons" under section 1983, the Court will dismiss the portions of the Complaint seeking relief against these state officials in their official capacities.").

In New Jersey, persons who report child abuse "have immunity from any liability, civil or criminal, that might otherwise be imposed." N.J.S.A. § 9:6–8.13; *see also Ashmore v. Ashmore*, 485 F. App'x 597, 601 (3d Cir. 2012). In other words, this provision "affords a qualified immunity by protecting those who report in *good faith*." *Nead v. Union Cty. Educ. Servs. Comm'n*, No. A-3149-09T1, 2011 WL 166245, at *10 (N.J. App. Div. Jan. 20, 2011) (emphasis added) (quoting *F.A. by P.A. v. W.J.F.*, 280 N.J. Super. 570, 580 (App. Div. 1995)). The statutory protection is commonly referred to as "reporting immunity."

Additionally, N.J.S.A. 26:3-52 provides that

> No suit shall be maintained in any of the courts of this state to recover damages against any local board, its officers or agents, on proceedings instituted to remove and abate such nuisances and cause of disease, unless it shall be shown in the suit that the alleged nuisance and cause of disease did not exist, or was not hazardous and prejudicial to the public health, and unless it be shown that the board acted without reasonable and probable cause to believe that such nuisance did exist and that such foul or noxious odors, gases, vapors or other cause was in fact prejudicial and hazardous to the public health

N.J.S.A. § 26:3-52. This statute therefore prevents suits against local health boards and their representatives, unless they act "without reasonable and probable cause to believe" that the nuisance they were investigating existed.

The Court declines to apply these state law immunities to the present case. As a general rule, state law immunities cannot form the basis of a defense to federal law. *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (concluding that the state cannot impart immunity from the laws of the United States); *Jimenez v. Lakelands Racing Ass'n, Inc.*, 567 F. Supp. 1298, 1303 (W.D. Pa. 1983) (same). Additionally, even if these immunities were permitted, they do not apply to the present case. First, the reporting immunity only applies to those who report child abuse to the DCPP. *See* N.J.S.A. § 9:6–8.13 ("*Anyone acting pursuant to this act in the making of a report . . . shall have*

15

immunity from any liability . . .") (emphasis added). Plaintiffs only allege that they were told that "the husband of the woman who lives next to the Kelly family" made the allegedly false allegation to the DCPP. FAC ¶¶ 167-68. Even assuming this statement refers to Baldwin, since he is not a Municipal Defendant, this statement does not link any Municipal Defendant to the allegations of false reporting. Moreover, as noted, New Jersey only applies the immunity if the person acts in good faith. Plaintiffs assert just the opposite: the child neglect allegations had no basis in fact. Therefore, the immunity found in N.J.S.A. § 9:6–8.13 does not apply to the Municipal Defendants.

Second, the immunity for health officials could only arguably apply to the investigation of the kennel because it applies to "proceedings instituted to remove and abate such nuisances and cause of disease." N.J.S.A. § 26:3-52. The subject of this suit is the DCPP investigation, not the investigation and subsequent closing of the kennel. Therefore, this statutory safe haven is inapplicable to the case at bar.

The last general argument made by the Municipal Defendants is that there is not "a shred of corroboration that Mr. Moreno then conspired with Defendant Baldwin . . . in his alleged plot to falsely accuse Plaintiffs[] of child abuse and neglect to the DCPP." Mun. Def. Br. at 13. However, this is not the appropriate standard on a motion to dismiss. The standard is plausibility, not corroboration. *See Twombly*, 550 U.S. at 570. Thus, this argument also lacks merit.

Count I – Section 1983 False Imprisonment

Section 1983 is not a source of substantive rights, instead it provides a vehicle for vindicating the violation of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

16

or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. Thus, to establish a Section 1983 claim, a plaintiff must demonstrate that (1) there was a violation of a right under the Constitution and (2) the violation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The Fourth Amendment protects against unreasonable seizures of the person. *See* U.S. Const. amend. IV. The Fourth Amendment, in turn, is applicable to the States through the Fourteenth Amendment. *Baker v. McCollan*, 443 U.S. 137, 142 (1979). A false imprisonment claim that "is based on an arrest without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures." *Id.* at 636. An unlawful detention outside this context may still give rise to a false imprisonment claim, but such a claim is premised solely on the Fourteenth Amendment. *Potts v. City of Phila.*, 224 F. Supp. 2d 919, 937 (E.D. Pa. 2002).

In Count I, Plaintiffs bring a Section 1983 false imprisonment claim against Defendants, alleging a violation of their Fourth and Fourteenth Amendment rights. FAC ¶¶ 177-180. Neither party, however, sets forth the elements for a claim of false imprisonment. "To state a claim for false imprisonment, a plaintiff must establish: (1) that she was detained; and (2) that the detention was unlawful." *James v. City of Wilkes-Barre*, 700 F.3d 675, 682–83 (3d Cir. 2012). Plaintiffs' false imprisonment claims concern the four investigations by the DCPP.

Plaintiffs' only plausible allegation as to Defendant Moreno (the sole remaining Municipal Defendant) is that Robert Kelly observed Moreno on the hill behind Kellys' property and then getting into his vehicle. FAC ¶¶ 153-59. Robert Kelly saw Moreno *after* the four DCPP investigations. This allegation is not sufficient to demonstrate Moreno's involvement in any of the DCPP investigations. The remainder of Plaintiffs' allegations related to Defendant Moreno

are pure speculation, *see* note 12, *supra*, or irrelevant, *see* FAC ¶ 63 (stating that Moreno investigated the kennel which led to its eventual closure). Therefore, the FAC fails to plausibly allege Moreno's involvement in the DCPP investigations, which form the basis of Plaintiff's false imprisonment claim. Count I is dismissed without prejudice as to Defendant Moreno.

Count II – Section 1983 Child Abuse

Count II is a Section 1983 claim for a violation of Plaintiffs' rights to be free from child abuse and neglect investigations absent credible evidence of such abuse, based on the Fourth and Fourteenth Amendments. FAC ¶¶ 181-83. The Municipal Defendants argue that "[t]o the extent Plaintiffs argue that their civil rights were violated without due process is a 'state-created danger' theory of liability," their claim must fail. Mun. Def. Br. at 17-20. However, Plaintiffs do not plead such a theory of liability Instead, Plaintiffs argue that they have a right to family integrity under the Fourth and Fourteenth Amendments and that this right has been violated by the Municipal Defendants. Pl. Mun. Opp'n at 21-24. The Municipal Defendants respond that they had nothing to do with the DCPP investigations, and even if they had, the DCPP is fully within their province to investigate allegations of child abuse and conduct interviews, including visits to the home and children's schools. Mun. Def. R.Br. at 17-19.

There is a "constitutionally protected liberty interest[] that parents have in the custody, care and management of their children." *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997). This right is governed by the Due Process Clause of the Fourteenth Amendment, which "prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." *Id.*[15]

---

[15] Although asserted by Plaintiffs, the Fourth Amendment does not appear applicable.

However, this interest is not absolute, but "is limited by the compelling governmental interest in the protection of children —— particularly where the children need to be protected from their own parents." *Id.* In other words, the right to family integrity "*does not include* a right to remain free from child abuse investigations." *Id.* (emphasis added). Thus, "[w]hatever disruption or disintegration of family life [plaintiffs] may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation." *Id.* at 1125-26. In short, the complained of conduct here – several DCPP investigations (without any concomitant action) – does not appear to be a protected constitutional right.

Plaintiffs cite to numerous cases regarding the right to family integrity. Again, the right to family integrity is not the critical issue; instead, the issue is whether that right encompasses the right to be free from a child neglect investigation. None of Plaintiff's cases is akin to the current situation. In many of the cases cited by Plaintiffs, the children were physically removed from their parents' custody. *See, e.g., Miller v. City of Phila.*, 174 F.3d 368 (3d Cir. 1999) (asserting due process claims in connection with emergency *ex parte* child custody hearing that resulted in removal of two children from the mother's custody); *Croft*, 103 F.3d at 1124-25 (asserting due process violations when case worker threated to immediately remove a child from the home unless the father left the home and had no contact with his daughter).

Here, the Kelly Children were not removed from their home, nor did Plaintiffs allege that DCPP officials made threats to remove the children. Rather, the DCPP performed traditional investigative functions in connection with an allegation of abuse and neglect: following up at the school, speaking with the children, visiting the home, and interviewing the parents. Thus, Plaintiffs fail to state a claim for a violation of their right to family integrity. Count II is dismissed without prejudice as to Defendant Moreno.

19

Count III – Section 1985 Conspiracy

Next, Plaintiffs bring a conspiracy claim pursuant to 42 U.S.C. § 1985. FAC ¶¶ 184-88. The Municipal Defendants argue that there is no evidence of a conspiracy set forth in the FAC. Mun. Def. Br. at 21-22. Plaintiffs respond that the FAC adequately alleges that "the Municipal Defendants . . . conspired to deprive Plaintiffs of the Fundamental Constitutional Right of family integrity and acted to deprive the Plaintiffs of that right by causing them to be subject to [DCPP] investigations, searches, and seizures without any reasonable belief that there was substantive evidence of imminent abuse or neglect of the children." Pl. Mun. Opp'n at 25.

To sufficiently plead a Section 1985(3) claim, a plaintiff must establish:

> (1) a conspiracy; (2) for the purpose of depriving a person or class of persons equal protection under the law or equal privileges and immunities under the law; (3) an act in furtherance of the conspiracy; and (4) injury to a plaintiff's property or his person, or deprivation of a right or privilege of a U.S. citizen.

*McArdle v. Hufnagel*, 588 F. App'x 118, 120 (3d Cir. 2014).[16] In addition, a claim for conspiracy "must contain supportive factual allegations." *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 484 (D.N.J. 2009). "The factual allegations supporting the conspiracy claim may not be generalized or conclusory." *Id.*; *see also Schlichten v. Cty. of Northampton*, 279 F. App'x 176, 179 (3d Cir. 2008) (requiring a conspiracy to be pled with specificity); *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 605 (D.N.J. 2002) (finding that conclusory allegations that a conspiracy exists will not survive a motion to dismiss). Instead, "a plaintiff must set forth allegations that address the period of the

---

[16] Section 1985(3) actions are limited to conspiracies predicated on "racial, or perhaps otherwise class based, invidiously discriminatory animus." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *Falat v. Cty. of Hunterdon*, No. 12-6804, 2014 WL 6611493, at *13 (D.N.J. Nov. 21, 2014) ("The conspiracy must be directed at the plaintiff because he belongs to a given class."). The Court does not see any such allegation in the FAC, but since the Municipal Defendants fail to raise this argument, the Court will not address it.

conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Ivan*, 595 F. Supp. 2d at 484. Plaintiffs must also demonstrate that there was a "meeting of the minds" among the conspirators. *Startzell v. City of Phila., Pa.*, 533 F.3d 183, 204 (3d Cir. 2008).

Here, Plaintiffs do not plausibly plead a Section 1985 conspiracy. The sole allegation of Moreno's participation in the conspiracy is Mr. Kelly observing Moreno on the hill at the back of his house after the DCPP investigations. *See* note 12, *supra*. In addition, at best, the FAC merely indicates that the DCPP confirmed that Baldwin was behind the investigation. To be sure, there are numerous general and conclusory allegations that the Municipal Defendants "conspired between and among themselves, beginning on or about April 29, 2013" to violate Plaintiffs' constitutional rights. FAC ¶¶ 185-86. But these conclusory allegations do not fulfill the plausibility requirement. Thus, as pled, Plaintiffs fail to allege a Section 1985 conspiracy. Count III is dismissed without prejudice as to Defendant Moreno.

Count IV – NJCRA False Imprisonment

Plaintiffs also assert an NJCRA violation based on false imprisonment. FAC ¶¶ 189-192. Again, neither party sets forth the elements required to plead a claim for false imprisonment pursuant to the NJCRA. The NJCRA is interpreted analogously to Section 1983. *See Ianuale v. Keyport Twp.*, No. 15-8256, 2016 WL 5955527, at *7 (D.N.J. Oct. 13, 2016) ("[C]ourts apply the same standard for false arrest and false imprisonment under both § 1983, NJCRA and New Jersey common law."); *see also Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). Count IV is therefore dismissed for the same reasons as stated in the analysis of Count I brought under Section 1983.

Statute of Limitations

Since the Municipal Defendants and the State Defendants make the same arguments concerning the statute of limitations, the Court will address their motions as to this issue together. Defendants argue that Plaintiffs' claims are time-barred by the statute of limitations. Mun. Def. Br. at 24-26; State Def. Br. at 12-14. They also argue that Section 1983 claims are subject to New Jersey's two-year statute of limitations on personal injury actions. Mun. Def. Br. at 25. Since Plaintiffs allege the DCPP investigations began in May of 2013, and the alleged conspiracy to make false allegations to the DCPP necessarily occurred before that, the statute of limitations had run when Plaintiffs filed their initial Complaint on June 13, 2016. *Id.* at 25-26.

Plaintiffs admit that their claims are subject to a two-year statute of limitations, but argue that they did not become aware of the conspiracy until June 13, 2014 (when Robert Kelly saw Moreno and Baldwin in his backyard), and therefore they were within the two year statute of limitations when they filed their Complaint. Pl. Mun. Opp'n at 26-28. Plaintiffs also respond that Abigail was a minor in June of 2014, when they uncovered the conspiracy, and M.K. remains a minor, therefore taking the Kelly Children outside the applicable statute of limitations. *Id.* at 28.

The statute of limitations is an affirmative defense not normally decided on a motion to dismiss. *See Crump v. Passaic Cty.*, 147 F. Supp. 3d 249, 259 (D.N.J. 2015). However, "where the complaint facially shows noncompliance with the limitations period," the statute of limitations can be determined on a motion to dismiss. *Id.* Here, the FAC sets out the dates of the DCPP investigations, concluding with the fourth and final investigation in May of 2014. *See* FAC ¶¶ 137, 145. Therefore, it initially appears that the statute of limitations at this stage.

"[S]tate law provides the statute of limitations applicable to a section 1983 claim." *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010). A Section 1983 claim is characterized as a personal injury claim and governed by the state's statute of limitations for personal injury claims.

*Id.* In New Jersey, personal injury torts have a two-year statute of limitations. *Id.* "State law, unless inconsistent with federal law, also governs the concomitant issue of whether a limitations period should be tolled." *Id.* Under New Jersey law, the statute of limitations in a personal injury case may be tolled based on equitable principals, including the discovery rule. *Id.* The discovery rule postpones a claim from accruing until the "injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, that he may have a basis for an actionable claim." *Id.* (quoting *Lopez v. Swyer*, 62 N.J. 267, 300 (1973)). The Third Circuit applies the discovery rule to Section 1983 actions, finding that it is consistent with federal law. *Id.* at 188; *Rolax v. Whitman*, 175 F. Supp. 2d 720, 727 (D.N.J. 2001) ("Federal and New Jersey state law relating to the accrual of causes of action and the effect of the 'discovery rule' are essentially the same."), *aff'd*, 53 F. App'x 635 (3d Cir. 2002).

However, federal law governs what constitutes accrual, as opposed to the tolling, of a cause of action. *Dique*, 603 F.3d at 186. Generally, "the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages." *Id.* at 185-86 (internal quotation marks omitted). Nonetheless, if the discovery rule applies, it tolls the accrual date of a cause of action.

The pivotal inquiry for the Court is when the statute of limitations began to run. Plaintiffs claim that they were not "reasonably aware" of the alleged conspiracy until June 13, 2014. Pl. Mun. Opp'n at 26-27. Defendants, on the other hand, contend that the statute of limitations should have started to run when the DCPP investigations concluded in May of 2013. Mun. Def. Br. at 25. At that point, they argue, the alleged conspiracy to make false accusations to the DCPP must have already occurred. *Id.*

The Plaintiffs have made sufficient allegations concerning the statute of limitation to preclude dismissal at this time. Normally, courts permit the parties to take discovery on the issue of when plaintiffs reasonably discovered, or could have reasonably discovered, that they had a viable cause of action. *See SC Holdings, Inc. v. A.A.A. Realty Co.*, 935 F. Supp. 1354, 1368 (D.N.J. 1996) (applying the discovery rule and finding that, at the motion to dismiss stage the court "cannot conclude at this point in the litigation that the claim is time-barred"). Thus, the Court finds at this stage that the statute of limitations does not warrant dismissal.

Additionally, "[t]he statute of limitations on a personal injury claim by a minor is tolled until the minor reaches the age of majority." *Alberts v. Gaeckler*, 446 N.J. Super. 551, 568 (Law. Div. 2014) (citing N.J.S.A. 2A:14-2.1). Since Plaintiff Abigail Kelly was a minor on June 13, 2014, and Plaintiff M.K. is still a minor, their claims are both within the applicable statute of limitations. Thus, the Court denies Defendants' motions with respect to the statute of limitations vis-a-vis the Kelly Children's claims.[17]

Therefore, Defendants' motions are denied as to the statute of limitations. The State Defendants, and the Municipal Defendants if an appropriate amended complaint is filed, may take discovery on the issue as to Robert and Elizabeth Anne Kelly.

---

[17] The State Defendants concede that their statute of limitations argument does not apply to the Kelly Children. *See* State Def. R.Br. at 3.

**b. The State Defendants' Motion to Dismiss**

Count II – Qualified Immunity[18]

The State Defendants first argue that they are entitled to qualified immunity as Count II. State Def. Br. at 14-17. Interpreting Count II as a Fourteenth Amended substantive due process claim, the State Defendants argue that this claim does not include a right to be free from investigations into child abuse. *Id.* at 17-20. In response, Plaintiffs contend that the State Defendants knew the information they received was false and nonetheless acted on it, "assuming [they] could rely on state statutes requiring caseworkers to investigate claims of child abuse and qualified immunity." Pl. State Opp'n at 10.[19]

"Qualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[18] The State Defendants do not address qualified immunity with respect to Count I (false imprisonment under Section 1983), and do address either Count I or Count IV (false imprisonment under the NJCRA) in their motion to dismiss. Therefore, these Counts remain as to the State Defendants. As discussed in note 18, *infra*, Plaintiffs address Count I in their opposition, to which the State Defendants reply. However, the issue was not raised the State Defendants' initial brief, and will not be considered by the Court. *See Smithkline Beecham PLC v. Teva Pharm. USA, Inc.*, No. 04-0215, 2007 WL 1827208, at *1 (D.N.J. June 22, 2007) ("Reply briefs are not the time to present new argument.").

[19] Plaintiffs make additional arguments that are irrelevant and not accurate. First, Plaintiffs discuss the Fourth Amendment's right to protect against unreasonable searches and seizures. Pl. State Opp'n at 6-10. This discussion appears related to Plaintiffs' claim for false imprisonment. However, the State Defendants only discuss qualified immunity in the context of Count II and therefore Plaintiffs' arguments as to the false imprisonment claims (Counts I and IV) are inapposite. Next, Plaintiffs argue that, if a person does not have reasonable cause to believe that a child has been subject to abuse, then they could have an action for a malicious abuse of process "for the damage that the false report has caused their family." *Id.* at 17. Plaintiffs proceed to describe how the DCPP Defendants had no evidence of imminent abuse or neglect. However, Plaintiffs are mistaken. A claim for malicious prosecution would be against the reporter of the abuse, not the DCPP Defendants whose job was to investigate such reports. *See F.A. by P.A.*, 248 N.J. Super. at 491 (finding that a parent could have a claim for "malicious abuse of process" against a neighbor who maliciously reported a plaintiff for child abuse). Therefore, both of Plaintiffs' arguments lack merit.

which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014). A court must engage in a two-part inquiry to determine whether qualified immunity applies: (1) "whether the allegations, taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right;" and (2) "whether the law was clearly established at the time of the violation." *Ihlenfeld v. Darby Borough Police Dep't*, No. 16-01990, 2017 WL 132169, at *6 (E.D. Pa. Jan. 13, 2017). "The defendant has the burden of establishing qualified immunity." *Id.*

As previously discussed, there is a "constitutionally protected liberty interest[] that parents have in the custody, care and management of their children." *Croft*, 103 F.3d at 1125. This right is limited, and "does not include a right to remain free from child abuse investigations." *Id.* Thus, "[w]hatever disruption or disintegration of family life [plaintiffs] may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation." *Id.* at 1125-26.

As noted in the discussion concerning the Municipal Defendants, the right to family integrity does not appear to include a right to be free from child neglect investigations. Certainly, such a right, if it exists, is not clearly established. The Court has not found, and Plaintiffs do not cite to, any Supreme Court or Third Circuit case law establishing that the alleged DCPP investigations constitute a constitutional violation in the first instance. In fact, the Third Circuit held recently that "the [Supreme] Court has never found a substantive due process violation when state agencies *temporarily remove a child*, whatever the circumstances of the removal." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 170 (3d Cir. 2016) (emphasis added). The Third Circuit has stressed that "[c]aseworkers investigating allegations of child abuse often must make difficult decisions based on imperfect information." *Id.* Therefore, caseworkers

"are protected by qualified immunity unless clearly established law puts them on notice that their conduct is a violation of the Constitution." *Id.*

Here, there have been no allegations of temporary removal. Instead, Plaintiffs describe four DCPP investigations, all of which were determined to be unfounded. Since the DCPP investigations are not part and parcel of the right to "family integrity" provided by the Fourteenth Amendment, the State Defendants did not violate a clearly established right. Thus, the State Defendants are, at a minimum, entitled to qualified immunity. *See Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012) (finding that a social worker was "entitled to qualified immunity on the ground that she did not violate any clearly established right protected by the Fourth Amendment when she interrogated [a child] as part of an investigation of the child's welfare"). Count II is dismissed without prejudice as to the State Defendants.

Count III – Section 1985 Conspiracy

The State Defendants make a two-fold argument as to Plaintiffs' conspiracy claim: (1) the FAC does not adequately plead conspiracy; and (2) Plaintiffs are not a suspect class and therefore not protected by Section 1985. State Def. Br. at 20-25. For reasons stated as to the Municipal Defendants, the Court agrees that the conspiracy allegations are not plausibly pled. The Court also agrees with the State Defendants as to the suspect class assertion.

As noted, Section 1985(3) actions are limited to conspiracies predicated on "racial, or perhaps otherwise class based, invidiously discriminatory animus." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *Falat v. Cty. of Hunterdon*, No. 12-6804, 2014 WL 6611493, at *13 (D.N.J. Nov. 21, 2014) ("The conspiracy must be directed at the plaintiff because he belongs to a given class."). Since Plaintiffs fail to allege that they are members of a suspect class, or that the

conspiracy was predicated on racial or discriminatory animus, their Section 1985 claim fails. Count III is dismissed as to the State Defendants without prejudice.

## Count VII – Injunctive Relief

In Count VII, Plaintiffs seek an injunction against Defendants Von Pier and Blake in their official capacities as DCPP Director and DCF Commissioner. FAC ¶¶ 34-35, 203-210. Plaintiffs allege that Von Pier and Blake "failed to promulgate adequate rules and regulations regarding avoidance of threats and abuse of process in the investigations of allegations of child abuse" and "failed to instruct, discipline and train in the appropriate methods for handling and investigating allegations of child abuse without resorting to threats and abuse of process." *Id.* ¶ 206. Essentially, Plaintiffs allege that Von Pier and Blake established a policy of allowing DCPP workers to "commit abuse of process," which resulted in "indifference to the constitutional rights of plaintiffs." *Id.* ¶ 207. This policy, allege Plaintiffs, violated their Fifth and Fourteenth Amendment Rights. [20] *Id.* ¶ 209. Thus, Plaintiffs seek an injunction "requiring that the explicit instruction and policy be made requiring DCPP workers to refrain from abuse of process." *Id.* ¶ 210.

The State Defendants argue that Plaintiffs lack standing to seek injunctive relief because they have not asserted a likelihood of future injury, namely that they will again be subject to an investigation by the DCPP. State Def. Br. at 25-28. [21] In response, Plaintiffs argue that because

---

[20] Plaintiffs make this Section 1983 claim pursuant to both the Fourteenth and Fifth Amendments. The Court does not see the applicability of the Fifth Amendment, but the State Defendants did not raise the issue. As a result, this Opinion does not address the applicability of the Fifth Amendment.
    Also, as discussed, the Court does not find that the constitutional right to family integrity encompasses the right to be free from child neglect investigations. Thus, Count VII would appear to fail because it does not properly allege an underlying constitutional right. Again, the State Defendants did not argue this point, so the Court declines to address it here.

[21] The State Defendants also argue that even if Plaintiffs have standing to proceed, Count VII must fail since Plaintiffs have an adequate remedy at law in the form of a suit for damages. *Id.* at 28.

28

Plaintiff M.K. is still a minor, "she is subject to continuing [u]nconstitutional investigations by the [DCPP]." Pl. State Opp'n at 27-28. By way of example, Plaintiffs point out that M.K. missed months of school following the investigations and was evaluated by a psychologist in 2015. *Id.* at 27.

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In order to have Article III standing, a plaintiff bears the burden of establishing "(1) [an] injury-in-fact ... that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) [a likelihood] ... that the injury will be redressed by a favorable decision." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005). When, as in this case, prospective relief is sought, the plaintiff must show that he is "likely to suffer future injury[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Thus, "even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (quoting *Lyons,* 461 U.S. at 111); *see O'Shea v. Littleton,* 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy

---

Plaintiffs do not address this argument. While it is unnecessary to the Court's decision, the State Defendants appear to be correct. A party seeking injunctive relief must, among other things, demonstrate "irreparable harm if the injunction is denied[.]" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). "Irreparable harm" requires a plaintiff to show that money damages are inadequate. *See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("The requisite feared injury or harm must be ... of a peculiar nature, so that compensation in money cannot atone for it.") (internal quotation marks omitted). Plaintiffs do not allege why monetary damage would be insufficient to prevent DCPP from further violating their constitutional rights.

regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). "Critically, in considering the likelihood of future injury, the Supreme Court has 'been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury.'" *Thomas v. Jones*, 428 F. App'x 122, 124 (3d Cir. 2011) (quoting *Honig v. Doe*, 484 U.S. 305, 320 (1988)).

Plaintiffs do not sufficiently allege that there is a likelihood they will be subject to another investigation by the DCPP. Over two years passed between the final investigation in May, 2014 and the filing of Plaintiffs' original Complaint. Plaintiffs do not allege any investigation in the intervening two-year period. The effects of the investigations on M.K. goes to Plaintiffs' damages, not a likelihood that this type of harm would occur again. Therefore, Plaintiffs have not plausibly alleged a likelihood of future harm necessary to confer standing for injunctive relief. Count VII is dismissed without prejudice.

## V. CONCLUSION

In sum, the Court **GRANTS IN PART AND DENIES IN PART** the Municipal Defendants' motion. The Municipal Defendants' motion is **GRANTED** as to Counts I-V, and those counts are dismissed without prejudice. The motion is **DENIED** as to the statute of limitations without prejudice. The Court also **GRANTS IN PART AND DENIES IN PART** the State Defendants' motion. The State Defendants' motion is **GRANTED** as to Count II, III, and VII, and those counts are dismissed without prejudice. The motion is **DENIED** as to the statute of limitations without prejudice. Plaintiffs have thirty (30) days to file a second amended

complaint, if they so choose, consistent with this Opinion and in accordance with Local Civil Rule 15.1.[22]  An appropriate Order accompanies this Opinion.

**Date:** August 8, 2017

JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE

---

[22] Effective May 10, 2017, Local Civil Rule 15.1 states, in part, that:

> A party who files an amended pleading in response to an Order authorizing the filing of that pleading to cure a defect in its pleading shall file:
>
> (1) a copy of the amended pleading, complete with a handwritten or electronic signature; and
>
> (2) a form of the amended pleading that shall indicate in what respect(s) it differs from the pleading that it amends, by bracketing or striking through materials to be deleted and underlining materials to be added.